The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 19, 2026

## 2026COA16

**No. 23CA1886, *Michel L. Schlup Revocable Trust v. Attorneys Title Guaranty Fund, Inc.* — Insurance — Title Insurance — Complete Defense Rule**

To resolve this appeal, a division of the court of appeals must consider, as a matter of first impression, whether the complete defense rule — a rule that requires an insurer to provide a defense for the insured on all claims if any claim is arguably covered by the policy — applies in the title insurance context. Because the division concludes that it doesn't and agrees with the district court that the insurance company defendant properly denied coverage for the insured plaintiff, the division affirms the district court's grant of summary judgment in favor of the insurance company.

Court of Appeals No. 23CA1886
City and County of Denver District Court No. 22CV33691
Honorable Martin F. Egelhoff, Judge

Michel L. Schlup Revocable Trust,

Plaintiff-Appellant,

v.

Attorneys Title Guaranty Fund, Inc.,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Brown and Moultrie, JJ., concur

Announced March 19, 2026

RICE LLC, T.R. Rice, Elizabeth, Colorado, for Plaintiff-Appellant

Karsh Gabler Call PC, Ivan M. Call, Lakewood, Colorado, for Defendant-Appellee

¶ 1    In this insurance coverage dispute, plaintiff, the Michel L. Schlup Revocable Trust (the Trust), appeals the district court's grant of summary judgment in favor of defendant, Attorney Title Guaranty Fund, Inc. (ATGF).  Although ATGF provided the Trust with a defense and indemnification against claims asserted by one of the Trust's neighbors, it refused to provide either a defense or indemnification with respect to claims brought in the same litigation by a different neighbor, asserting that those claims weren't covered by the title insurance policy.  After resolving both sets of claims, the Trust sued ATGF for its failure to provide a defense to the latter set of claims brought by the second neighbor.

¶ 2    The district court granted summary judgment in favor of ATGF, concluding that ATGF didn't have a duty to defend the Trust against the claims asserted by the second neighbor either under the terms of the policy or pursuant to the complete defense rule, which requires an insurance company to provide a defense to all of the claims asserted in a piece of litigation if any one of the claims is arguably covered by the policy.  On appeal, the Trust argues that the district court erred in both respects.

¶ 3    To resolve this appeal, we must consider, as a matter of first impression, whether the complete defense rule applies in the title insurance context.  Because we conclude that it doesn't and because we agree with the district court that coverage was properly denied, we affirm.

## I.    Background

¶ 4    The district court relied on the following undisputed facts in its order granting summary judgment.  In 2018, the Trust purchased an undeveloped parcel of land in Estes Park, Colorado (the Property).  An unimproved private road (Homestead Lane), which crossed multiple adjacent properties, was the only access between the Property and nearby State Highway 34.

¶ 5    As part of the transaction, the Trust purchased a title insurance policy from ATGF.  Covered Risk 4 of the title insurance policy covered loss or damage to the Trust as a result of "no right of access to and from the [Property]."

¶ 6    After closing, the Trust began to construct a residence on the Property, which required it to improve the portion of Homestead Lane leading to the Property.  In the process, the local fire protection district determined that, if any portion of Homestead

Lane was improved, the entirety of Homestead Lane would have to be paved to bring it into compliance with the Estes Valley Fire Protection District's fire code.

¶ 7     In 2021, the Trust began paving Homestead Lane. Later that year, Nicholas Stark, the owner of a nearby parcel that Homestead Lane traversed, sued the Trust, claiming that the Trust had no legal right of access to the Property across his property. The Trust submitted Stark's claims to ATGF, and ATGF retained an attorney who successfully defended the Trust against Stark's claims.

¶ 8     In early 2022, Michael Nassimbene, the owner of a second parcel adjacent to the Property that included a portion of Homestead Lane, intervened in the Stark lawsuit. Nassimbene asserted two causes of action against the Trust — trespass and unjust enrichment. Both claims were based on the Trust's paving the portion of Homestead Lane running across Nassimbene's property without Nassimbene's consent.

¶ 9     Material to this appeal, Nassimbene didn't dispute that the Trust had an easement across his property via Homestead Lane to access the Property; Nassimbene did, however, dispute the Trust's right to *improve* that easement over his objection. In his complaint,

Nassimbene contended that the Trust was trespassing by paving, without his consent, the portion of Homestead Lane that crossed his property. He also averred that the Trust had unjustly enriched itself by increasing Nassimbene's cost of maintaining Homestead Lane under a shared maintenance agreement without committing to cover that cost increase.

¶ 10     The Trust submitted Nassimbene's claims to ATGF for defense and indemnification. ATGF declined to defend, asserting that the claims weren't within the scope of coverage and, even if they were, they were subject to exclusions contained in the policy. Because of ATGF's denial, the Trust hired its own counsel to defend against Nassimbene's claims. The Trust eventually settled with Nassimbene.

¶ 11     After settling with Nassimbene, the Trust sued ATGF, contending that ATGF was required to defend against Nassimbene's claims because they were covered by the title insurance policy. The Trust also argued, in the alternative, that ATGF was obligated to defend against Nassimbene's claims under the complete defense rule. The court rejected both of the Trust's arguments and granted ATGF's motion for summary judgment.

## II. Issues on Appeal

¶ 12    The Trust advances two issues on appeal. First, the Trust argues that Nassimbene's claims implicated its right to access the Property and thus were covered by the title insurance policy. Second, the Trust argues that, even if Nassimbene's claims weren't covered by the policy, ATGF was nevertheless required to defend against them under the complete defense rule. For the reasons discussed below, we reject both contentions.

### A. The Policy Didn't Cover Nassimbene's Claims

¶ 13    First, the Trust argues that Nassimbene's claims implicated its right to access the Property and therefore it was insured against those claims under either Covered Risk 4 or Covered Risk 5 of the policy (or both). We disagree.

#### 1. Additional Facts

¶ 14    The title insurance policy insured the Trust against loss or damage arising from certain covered risks and obligated ATGF to "pay the costs, including attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions."

¶ 15    Among the covered risks in the policy, two are pertinent to this appeal.  Under Covered Risk 4, ATGF agreed to cover a defect in title if there is "[n]o right of access to and from the [Property]." Additionally, under Covered Risk 5, ATGF agreed to cover

> [t]he violation or encroachment of any law, ordinance, permit, or governmental regulation, (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to —
>
> (a) the occupancy, use, or enjoyment of the [Property];
>
> . . . .
>
> If a notice, describing any part of the [Property], is recorded in the Public Records setting forth the violation or intention to enforce, *but only to the extent of the violation or enforcement referred to in that notice.*

(Emphasis added.)  And "Public Records" under the policy are "[r]ecords established under state statutes at Date of Policy [July 11, 2018] for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without [k]nowledge."

¶ 16    The policy contains several exclusions to coverage. Exclusion 1(a) specifically excludes from coverage any losses due to

[a]ny law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

(i) the occupancy, use, or enjoyment of the [Property];

. . . .

or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

¶ 17    Exclusion 3 excludes from coverage

[d]efects, liens, encumbrances, adverse claims, or other matters

(a) created, suffered, assumed, or agreed to by the Insured Claimant . . .

. . . .

(d) attaching or created subsequent to Date of Policy [July 11, 2018] . . . .

¶ 18    As noted above, Nassimbene didn't dispute that the Trust had an easement to access the Property via Homestead Lane; instead, he asserted that the Trust's easement didn't include the right to pave the portion of Homestead Lane running across his property. Nassimbene claimed that by paving the road without authorization, the Trust had trespassed on his property and damaged shade trees

7

and other vegetation. Nassimbene also described a maintenance agreement between himself and several neighbors to share the costs associated with maintaining several local private roads — including Homestead Lane. Under this agreement, a majority of the signatories to the maintenance agreement was required to approve any maintenance expenditures, which hadn't occurred. He alleged that the Trust had unjustly enriched itself to his detriment by increasing the cost of maintaining Homestead Lane without committing to cover that cost.

¶ 19    ATGF refused to indemnify or defend the Trust against Nassimbene's claims, so the Trust sued. ATGF moved for summary judgment, arguing that Nassimbene's claims weren't covered by the title insurance policy and that the complete defense rule shouldn't be applied in the title insurance context.

¶ 20    In granting summary judgment in ATGF's favor, the district court ruled that Nassimbene's claims weren't covered by the title insurance policy for three reasons. First, the district court determined that, under Covered Risk 5, ATGF was only obligated to defend against loss of access to the Property due to governmental codes and regulations if there was a recorded notice describing the

violation or an intent to enforce the violation of any code or regulation. Second, the district court reasoned that, under Exclusion 3(a) and (d), the title insurance policy didn't cover issues that were "'created, suffered, assumed or agreed to' by the Trust." Third, the district court declined to extend the complete defense rule to the context of title insurance, citing *Cherry Hills Farm Court, LLC v. First American Title Insurance Co.*, 428 F. Supp. 3d 516 (D. Colo. 2019).

### 2.  Standard of Review

¶ 21    We review a grant of summary judgment de novo. *Preferred Pro. Ins. Co. v. Drs. Co.*, 2018 COA 49, ¶ 11. Summary judgment is appropriate when there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Bainbridge, Inc. v. Travelers Cas. Co. of Conn.*, 159 P.3d 748, 750 (Colo. App. 2006).

¶ 22    Interpreting a contract presents a question of law that we review de novo. *Cagle v. Mathers Fam. Tr.*, 2013 CO 7, ¶ 16. An insurer has a duty to provide an insured a defense when the allegations in the underlying complaint, if sustained, would impose "liability potentially or arguably covered by the policy." *Bainbridge,*

9

159 P.3d at 750. To determine if it has the responsibility to defend against a claim, "[a]n insurer looks to the four corners of the complaint, together with the policy." *Id.* We do the same in determining whether the district court's grant of summary judgment was proper. *See id.*

### 3. Analysis

¶ 23 We address and reject the Trust's assertions of coverage under Covered Risk 4 and Covered Risk 5 separately below.

#### a. Nassimbene's Claims Aren't Covered by Covered Risk 4

¶ 24 The Trust argues that Nassimbene's claims implicated its right of access under Covered Risk 4, that the "no right of access" language in Covered Risk 4 is ambiguous, and that its right of access included the right to pave Homestead Lane, since absent that improvement, the Trust wouldn't be allowed to build a home on the Property. We reject the Trust's arguments because (1) the term "no right of access" isn't ambiguous, and Nassimbene's complaint didn't dispute that the Trust had a right of access over Homestead Lane; and (2) Covered Risk 4 doesn't insure access sufficient to develop the property.

### i. Nassimbene Didn't Challenge the Trust's Right to Access the Property

¶ 25 We begin our analysis by rejecting the Trust's assertion that, because the term "access" isn't defined in the title insurance policy, a "right of access" is ambiguous and includes something more than "access." The phrase "no right of access" in Covered Risk 4 isn't ambiguous. Access is defined as "[a] right . . . to enter, approach, [or] pass to and from." *Access*, Black's Law Dictionary 16 (12th ed. 2024). Therefore, "no right of access," as applied to the Trust, would mean that the Trust had no right to enter, approach, or pass to and from the Property.

¶ 26 Based on this understanding of the meaning of "no right of access," we conclude that Nassimbene's claims against the Trust didn't implicate Covered Risk 4 because the Trust didn't allege that it had "[n]o right of access to and from the [Property]." *See Am. Fam. Mut. Ins. Co. v. Hansen*, 2016 CO 46, ¶ 27 (courts apply unambiguous contractual language as written). Instead, Nassimbene claimed that the Trust had trespassed onto his land by paving and expanding the road, which damaged his land and unjustly enriched the Trust by potentially burdening Nassimbene

11

with significant future maintenance costs. Nothing in Nassimbene's complaint, however, challenged the Trust's right of access to the Property.

¶ 27     Nor was the Trust's right of access to the Property ever in jeopardy. The Trust never claimed that its ability to access the Property was curtailed, only that its ability to pave Homestead Lane so that it could develop the Property was. And the fire protection district never indicated that the Trust's right of access to the Property was contingent on paving Homestead Lane; it determined only that, if any portion of Homestead Lane was paved, the entirety of it would have to be paved to comply with the fire code.

ii.     Covered Risk 4 Doesn't Insure Access Sufficient to Develop the Property

¶ 28     In the alternative, the Trust argues that unencumbered access to and from the local highway isn't enough to satisfy its "right of access" under Covered Risk 4 — its right of access also has to be sufficient to develop the Property. The Trust cites *First American Title Insurance Co. v. GS Industries, LLC,* an unpublished federal district court case from Hawaii, as persuasive authority for the proposition that a right of access must be sufficient to develop a

12

property. No. 21-CV-00078-DKW-KJM, 2021 WL 5985124, at *4-8 (D. Haw. Dec. 16, 2021). *First American* doesn't support this proposition.

¶ 29    In *First American,* GS Industries obtained ownership of a parcel of land that had legal ingress but no legal egress because the public road that serviced the land was a one-way road and the portion of the road that allowed for egress from the land was privately owned. *Id.* at *1, *3. GS leased the land to a church that planned to build low-income housing units on the parcel. *Id.* at *3. While pursuing its plan to develop the land, the church applied for affordable housing exemptions from the Department of Planning and Permitting. *Id.* The Department denied the church's application due to the lack of egress. *Id.* The church submitted a claim to First American for the cost of obtaining legal egress from the land — estimated at approximately $10,000. *Id.*

¶ 30    After First American denied the claim multiple times, GS sued for a declaratory judgment to determine its rights under the policy. *Id.* at *4. First American argued that because the policy excluded issues with access that resulted from governmental regulation, it had no duty to cover the cost of obtaining egress. *Id.* The court

13

disagreed, ruling that the issue of lack of egress predated the governmental regulation and noting that the land had lacked legal egress before, and regardless of, the plans to develop the land. *Id.* at *7. Thus, the court reasoned, GS never had a complete right of access to the land, and its lack of access *wasn't* due to governmental regulation, but to a covered deficiency in the title to the land. *Id.* Put simply, the church in *First American* never had a right of access because the land never had legal egress.

¶ 31 The opposite is true here. The Trust had a right of access to and from the local highway via Homestead Lane when it purchased the Property. And it was only when the Trust decided to build a residence on the Property — which, in turn, required the Trust to pave a portion of Homestead Lane — that the fire protection district's regulations required the Trust to pave the entirety of Homestead Lane to comply with the fire code. Therefore, unlike in *First American,* the requirement for the Trust to *upgrade* access to the Property was a direct result of governmental regulation; it wasn't due to a pre-existing defect in the title. Consequently, Nassimbene's claims don't fall under Covered Risk 4. *See Bainbridge,* 159 P.3d at 750.

### b. Covered Risk 5 Doesn't Insure Against Nassimbene's Claims, Which Instead Fall Under Exclusions 1 and 3

¶ 32    We also conclude that Nassimbene's claims don't fall under the purview of Covered Risk 5 for three reasons.  To start, Covered Risk 5 requires notice of a regulation or of the intent to enforce the violation of a regulation to be in the public records as of the policy's effective date, and that such notice must mention at least part of the Property.  The Trust doesn't claim that any such notice as to the need to pave the entirety of Homestead Lane because of the fire code was present in the public records.

¶ 33    Second, while Covered Risk 5 covers violations and enforcement of governmental regulations, Exclusion 1 excludes from coverage any impact of governmental regulation on the Property if a notice of that impact isn't recorded as of the policy's effective date.  Because the mandatory paving of the entirety of Homestead Lane was incidental to the development of the Property and resulted from governmental enforcement occurring *after* the effective date of the policy, the Trust's argument fails.

¶ 34    Third, because the fire protection district didn't require the rest of Homestead Lane to be paved until the Trust decided to

develop the Property and upgrade the driveway, the enforcement of the fire code occurred *after* the policy's effective date. Therefore, the code enforcement issue was necessarily "created . . . by the Insured Claimant" and falls under Exclusion 3.

¶ 35 To put it simply, neither the nature of Nassimbene's claims, nor the case law on which the Trust relies, nor the terms of the title insurance policy support the argument that the Trust has "no right of access" unless it has sufficient access to develop the Property. Accordingly, we discern no error in the district court's determination that Nassimbene's claims weren't covered by the title insurance policy.

### B. Complete Defense Rule

¶ 36 The Trust next argues that, even if Nassimbene's claims weren't covered by the title insurance policy, ATGF was nonetheless obligated to provide a defense against the claims under the complete defense rule. We disagree.

### 1. Standard of Review

¶ 37 The complete defense rule requires an insurance company to defend against all the claims in a complaint or discrete piece of litigation if any one of the claims asserted in the litigation is

arguably covered by the policy. *See, e.g., Carl's Italian Rest. v. Truck Ins. Exch.*, 183 P.3d 636, 639 (Colo. App. 2007).

¶ 38     Whether a title insurance company has a duty to defend against a complaint is a question of law, which we review de novo. *Id.*

### 2. Analysis

¶ 39     The Trust argues that because Nassimbene's claims couldn't be easily bifurcated from Stark's original claims, and because both Nassimbene's and Stark's claims were asserted in a single suit and implicated the Trust's right to access the Property, ATGF was required to defend the Trust against both sets of claims under the complete defense rule. We aren't persuaded.

¶ 40     In holding that the complete defense rule doesn't apply to litigation involving title insurance, the district court relied substantially on *Cherry Hills*, 428 F. Supp. 3d at 522-24. In *Cherry Hills*, the federal district court for the District of Colorado correctly observed that no Colorado appellate case had applied the complete defense rule in a title insurance case. *Id.* at 522-23. Instead, Colorado courts have only applied the complete defense rule in a general liability context. *See id.* (collecting cases); *see, e.g., Sachs v.*

17

*Am. Fam. Mut. Ins. Co.*, 251 P.3d 543, 547 (Colo. App. 2010); *Carl's Italian*, 183 P.3d at 639; *Bainbridge*, 159 P.3d at 756; *Mgmt. Specialists, Inc. v. Northfield Ins. Co.*, 117 P.3d 32, 36 (Colo. App. 2004).

¶ 41    Based on decisions from other jurisdictions that have declined to apply the complete defense rule in the title insurance context, the court in *Cherry Hills* then predicted that the Colorado Supreme Court wouldn't apply the complete defense rule to a dispute involving title insurance coverage.  428 F. Supp. at 523-25.

¶ 42    For instance, in *GMAC Mortgage, LLC v. First American Title Insurance Co.*, 985 N.E.2d 823, 828 (Mass. 2013), the Massachusetts Supreme Judicial Court held that the complete defense rule is inapplicable in the context of title insurance litigation because title insurance is "fundamentally different from general liability insurance."  Specifically, the court noted that "[b]efore issuing a policy, a title insurer searches real property records for title defects and, if any are discovered, excludes such known defects from the policy coverage."  *Id.*  Accordingly, the court observed that title insurance is retrospective because it "narrowly covers defects in, or encumbrances on, titles that are in existence

18

when a policy issues," as opposed to general liability insurance, which covers prospective risks. *Id.* The *GMAC* court also observed that, unlike general liability insurance, which requires the payment of ongoing premiums, title insurance requires the payment of only a single premium for indefinite coverage. *Id.* at 828-29. The court in *GMAC* further reasoned that "the central policy behind [the complete defense rule] — that parsing multiple claims is not feasible — is not implicated to the same extent in the title insurance context as in the general liability insurance context" because the issues in title insurance disputes tend to be discrete and easily bifurcated from other related claims. *Id.* at 829-30 (recognizing that "an attorney for a title insurance company . . . feasibly can defend only the title-related issues").

¶ 43    And for many of the same reasons identified in *GMAC*, other jurisdictions have also concluded that the complete defense rule doesn't apply to title insurance litigation. *See Lupu v. Loan City, LLC*, 903 F.3d 382, 393-95 (3d Cir. 2018) (applying Pennsylvania law and predicting that the Pennsylvania Supreme Court would decline to apply the complete defense rule to title insurance disputes); *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391,

398-401 (7th Cir. 2014) (declining to apply the complete defense rule to a title insurance dispute under Illinois law); *Findlay v. Chi. Title Ins. Co.*, 2022 IL App (1st) 210889, ¶¶ 57-64 (endorsing *Philadelphia Indemnity*'s interpretation of Illinois law); *Badger Mining Corp. v. First Am. Title Ins. Co.*, 534 F. Supp. 3d 1011, 1021-22 (W.D. Wis. 2021) (holding that the complete defense rule doesn't apply to title insurance under Wisconsin law).

¶ 44    While we aren't bound by a federal court's interpretation of state law, *see Redden v. Clear Creek Skiing Corp.*, 2020 COA 176, ¶ 44, we are nonetheless persuaded by the convincing policy rationale presented in *Cherry Hills* and the out-of-state authority on which it relies.

¶ 45    In particular, the distinctions between title and general liability insurance convince us that the complete defense rule shouldn't extend to title insurance.  For instance, general liability insurance policies typically have broad language promising to defend against "'a suit' or 'any suit,'" *Cherry Hills*, 428 F. Supp. 3d at 524 (quoting *Phila. Indem.*, 771 F.3d at 399), whereas ATGF's title insurance policy promised to cover expenses "incurred in defense of any matter insured against by the Policy, but only to the

20

extent provided in the Conditions." Similarly, other language in the ATGF policy — namely, Covered Risk 5(a) — states that ATGF will only "provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy" and clarifies that "[ATGF] shall not be liable for and will not pay the fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy."

¶ 46 This clear language limiting ATGF's liability naturally invokes another reason not to extend the complete defense rule — the parties bargained for an unambiguous and limited range of liability. Expanding that liability without finding ambiguity in the contract would create a windfall for the insured party because the insured would be getting significant benefits that they didn't bargain or pay for. *See id.*; *see also Lupu*, 903 F.3d at 395 ("Given the relatively modest title insurance premium, if we force Stewart Title to cover more than it promised, [the insured] will receive a windfall."); *cf. Essentia Ins. Co. v. Hughes*, 2024 CO 17, ¶¶ 2, 52 (imposing less onerous coverage requirements on carriers providing specialty automobile insurance policies covering classic cars, rather than regular-use vehicles, based, in part, on the fact that "specialty

21

policies [carry] much more affordable premiums than those charged in standard policies for regular-use vehicles").

¶ 47 We are particularly convinced that it doesn't make sense to apply the complete defense rule in the context of title insurance because claims covered by a title insurance policy can be more readily bifurcated from other types of claims within a proceeding. Indeed, the rationale behind the application of the complete defense rule in the general liability context is that there is typically no reasonable means to bifurcate claims in such proceedings and apportion the costs of defending covered and noncovered claims. *See, e.g., GMAC*, 985 N.E.2d at 828 ("A rationale behind [the complete defense] rule is that dividing representation between covered and noncovered claims is impractical."); *cf. Equal Emp. Opportunity Comm'n v. S. Publ'g Co.*, 894 F.2d 785, 791 (5th Cir. 1990) (observing that the purpose of the complete defense rule is to require the insurer to bear the entire cost of defense when "there is no reasonable means of prorating the costs of defense between the covered and the not-covered items" (quoting *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224-25 (6th Cir. 1980))).

¶ 48    And the course of events here underscores the ease with which claims covered by title insurance can be readily split from other, noncovered claims in the same litigation. The attorneys retained by ATGF successfully defended the Trust against Stark's claim that the Trust had no legal right to access the Property via Homestead Lane. But because Nassimbene didn't contest the Trust's right to access the Property, the court's legal determination that the Trust had a right to use Homestead Lane didn't resolve Nassimbene's third-party claims for trespass and unjust enrichment arising from the Trust's paving of a portion of Homestead Lane. And the Trust was then able to retain counsel at its own expense and resolve Nassimbene's claims to its satisfaction. In sum, contrary to the Trust's suggestion that the Stark and Nassimbene claims weren't capable of being bifurcated, the history of these proceedings demonstrates otherwise.

¶ 49    The Trust also suggests that the rationale of *Cherry Hills* and the other cases declining to apply the complete defense rule to title insurance policies doesn't apply here. For instance, the Trust attempts to distinguish *Cherry Hills*, 428 F. Supp. 3d at 521-22, by suggesting that the court in *Cherry Hills* simply refused to extend a

title insurer's duty to defend to monetary claims, which don't affect title. But we reject such a distinction because Nassimbene's third-party claims *were monetary claims* for damages allegedly caused by the Trust's paving of Homestead Lane and for the future costs of maintaining the newly paved driveway. Put another way, even if Nassimbene's claims had been successful, an award of monetary damages to Nassimbene wouldn't have affected the Trust's title to the Property and corresponding ongoing right to use Homestead Lane for access. *See id.* at 522 (discussing how the noncovered claim did "not seek to enjoin the use or possession of the property").

¶ 50 In summary, we decline to apply the complete defense rule to the title insurance context. And because we have already rejected the Trust's assertion that Nassimbene's claims otherwise involved the Trust's right of access to the Property, we conclude that the district court properly granted summary judgment in ATGF's favor.

## III. Disposition

¶ 51 The judgment is affirmed.

JUDGE BROWN and JUDGE MOULTRIE concur.